<u>NOT FOR PUBLICATION</u>

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

JOHN KATSIGIANNIS,

    Petitioner,

v.

JOHN POWELL, et al.,

    Respondents.

Civil Action No. 20-17155 (BRM)

**OPINION**

**MARTINOTTI, DISTRICT JUDGE**

    Before this Court is the petition for a writ of habeas corpus ("Petition") of Petitioner John Katsigiannis ("Petitioner") brought pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Following an order to answer, Respondents filed a response to the petition (ECF No. 7) and Petitioner filed a reply (ECF No. 8). For the reasons set forth below, Petitioner's habeas petition is **DENIED**, and no certificate of appealability shall issue.

**I. BACKGROUND**

    The New Jersey Superior Court, Appellate Division provided the following factual summary on collateral appeal:[1]

> At the time of the assault, K.P. (Kelly) lived with her mother L.R. (Lucy) and maternal grandmother. Lucy had been dating [Petitioner] for a short period, and she testified that she and [Petitioner] would often bring Kelly along on dates, as she trusted [Petitioner]. [Petitioner] occasionally assisted with Kelly's care by changing diapers and babysitting while Lucy was at work.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Throughout the relationship, and because Lucy's mother would not allow [Petitioner] to spend nights at their residence, Lucy and Kelly frequently slept at [Petitioner's] house in Fair Lawn where [Petitioner] lived with his father, sister, uncle, and grandparents. One afternoon, [Petitioner] and Lucy invited friends over to [Petitioner]'s backyard for a barbeque and then a visit to a nearby public pool. During the party, [Petitioner] offered to take Kelly inside for a nap. Lucy agreed because she thought [Petitioner] "was going to give [her] a little bit of a break to sit down" and she "didn't think there was anything odd about it at the time."

When [Petitioner] did not soon return, Lucy testified at the second trial that she and [Petitioner]'s friend D.C. (David) went into the house to look for him. Lucy stated that she and David went to [Petitioner]'s bedroom upstairs and found the door closed, so David opened it slightly. In response, according to Lucy, [Petitioner] closed the door and told them to go outside because [Petitioner]'s grandmother was sleeping. Lucy testified that she assumed Kelly was in the room as well. She then stated that when she and David went downstairs, he said "[i]f that was my kid I would make sure she was okay." In response, because she trusted [Petitioner], she told David that Kelly was "upstairs with [[Petitioner]], she's okay."

As Lucy began to get ready to go to the pool, she noticed that [Petitioner] had changed Kelly into her "swimmie" diapers and bathing suit. At the pool, [Petitioner] and Lucy stayed in the shallow end with Kelly. [Petitioner] was holding Kelly in the water when Lucy noticed "that she was uncomfortable and . . . it looked like she was cold . . . ." Lucy asked [Petitioner] to give Kelly to her, and while he initially stated "I got her, I got her," he eventually complied. Lucy walked to a bench and quickly changed Kelly into a dry diaper.

Shortly thereafter, all members of the group except for David returned to [Petitioner]'s house. According to Lucy, [Petitioner] left the house a few minutes later "to go see [David] about something regarding a laptop." When [Petitioner] returned, his friends left. At this point, Lucy stated she was going to bathe Kelly, but [Petitioner] insisted that he do so. [Petitioner] walked her to the bathroom and closed the door. Lucy testified that shortly thereafter, she opened the bathroom door and saw Kelly without her clothes on and a bloody diaper on the floor.

Lucy grabbed Kelly, brought her back into the bedroom, and noticed an "open tear" on her vagina. Lucy screamed to call an ambulance,

2

but [Petitioner] replied "[o]h, that doesn't look like anything. That's okay." In response, Lucy stated that if [Petitioner] did not take them to the hospital, she was going to call her mother to do so. [Petitioner] drove Lucy and Kelly to the hospital, and Lucy spoke with emergency personnel regarding Kelly's condition. [Petitioner] testified that at this point, he left to meet with the party guests in order to "find out . . . any details about what had happened to [Kelly]." [Petitioner] returned to the hospital at approximately 3:00 a.m.

Leah Raguindin, M.D., was the first doctor to examine Kelly. Dr. Raguindin determined that Kelly sustained multiple lacerations to her hymenial tissue and referred her to Victor Valda, M.D., for surgery. She also referred Kelly to Julia Debellis, M.D., because of the type of damage and the fact that there was "no explanation for the injury."

Dr. Debellis, a board-certified specialist in child-abuse pediatrics, examined Kelly next. She spoke to [Petitioner] and Lucy separately regarding Kelly's injury. Dr. Debellis then performed a physical examination which revealed blood clots and bruising "all over the hymen," as well as lacerations on the hymen. She believed that the injury occurred within the previous day because the wound was "oozing blood" and concluded that the injury was caused by "[a]cute penetrating trauma." She also testified that the injury could not have been the result of activities such as "sitting in a baby's swing[,] . . . going down on a slide," or wiping the area. Dr. Debellis contacted the Division of Youth and Family Services (the Division) and the Bergen County Prosecutor's Office "because the injuries reflected penetrating trauma, and there was no history given about [Kelly] suffering penetrating trauma."

Shortly thereafter, Detective Michael Guzman of the Bergen County Prosecutor's Office and Detectives James Corcoran and Jeff Welsh of the Fair Lawn Police Department (FLPD) arrived at the hospital. FLPD Officer Sean Macys provided them with written statements he had obtained from [Petitioner] and Lucy. In [Petitioner]'s written statement, which was admitted at trial, he stated that prior to leaving for the pool, he "took [Kelly] up to [his] room and took her diaper off to put a swimming diaper on," and that night when he and Lucy "took [Kelly's] diaper off[,] [they] noticed it was full of blood." In Lucy's written statement, which she read into the record on cross-examination at the second trial, she stated that before they left for the pool, [Petitioner] changed Kelly's diaper and she "was in the room." Lucy also wrote that later, as she prepared to bathe Kelly, "when [she] took off [Kelly's] diaper there was blood in it."

3

After reviewing the statements, the officers confirmed the statements' contents with [Petitioner] and Lucy and asked [Petitioner] to accompany them to the pool. In his written report memorializing the investigation, Guzman noted that Lucy informed him that before they went to the pool, "with [[Petitioner]] present she changed [Kelly]'s diaper into a swimming diaper . . . ." Lucy also stated that later that night, she and [Petitioner] "decided to give [Kelly] a bath," and while preparing to do so, "they took off her clothing and diaper and noticed blood in the diaper." Guzman further indicated that [Petitioner] "gave the same recollection of the day," but did not record any specific statements he made.

At the pool, [Petitioner] led the officers to the garbage can containing the "swimmie" diaper, which they retrieved. Guzman opened the diaper and noticed "some type of pinkish fluid" inside it. The officers next sought to search [Petitioner]'s home, and [Petitioner] signed a form indicating his consent. They traveled to [Petitioner]'s home, and [Petitioner] directed them to his bedroom and the nearby bathroom where Kelly's diapers were thrown in the trash. Guzman retrieved baby wipes from the garbage can in the bedroom that he stated appeared to have blood on them and obtained a bloody diaper from the garbage can in the bathroom.

Once upstairs, [Petitioner] was not permitted to speak with his family members. Officers instructed [Petitioner] to remain in the upstairs bedroom, and he was always accompanied by one or more uniformed officers. [Petitioner]'s family members were congregated on couches in the family room, with a police officer stationed there. The police declined to allow [Petitioner]'s father to join him upstairs, and they also did not allow [Petitioner]'s grandmother to speak to him in Greek.

After returning to the hospital, the officers obtained [Petitioner]'s consent to search his vehicle. Following that search, Corcoran and Welsh asked [Petitioner] to go with them to the FLPD for an interview and recorded statement, and [Petitioner] agreed to do so. Corcoran and Welsh brought [Petitioner] to "an open common area" in the Detective Bureau and advised him of his *Miranda*[2] rights. [Petitioner] thereafter went into a nearby interview room and prepared a written statement, which was admitted at trial. In that second written statement, [Petitioner] again stated that "[he] took [Kelly] upstairs and changed her to her swim diaper" prior to going

---

[2] *Miranda v. Arizona*, 374 U.S. 436 (1966).

4

> to the pool, and prior to bathing her, he and Lucy "took her diaper off . . . and saw she was bleeding."
>
> Guzman arrived at the station and interviewed [Petitioner] along with Corcoran and Welsh. At that interview, [Petitioner] initially denied injuring Kelly, but later admitted that when he was changing her, his "finger did go in by accident. It wasn't intentional," and "a little bit of blood came off [his] finger." At this point, the officers arrested [Petitioner].

(ECF No. 7-12, *State v. Katsigiannis*, No. A-3342-18T2, 2020 WL 1933158, at *1-3 (N.J. Super. Ct. App. Div. April 2020).)

The Bergen County Grand Jury returned Indictment No. 08-06-1066-08, charging Petitioner with first-degree aggravated sexual assault, N.J.S.A. § 2C:14-2(a)(1) (count one) and endangering the welfare of a child, N.J.S.A. § 2C:24-4a (count two). (ECF No. 7-1 at 66-67.)

Petitioner's first trial ended in a mistrial. *Katsigiannis*, 2020 WL 1933158, at *1. On October 24, 2012, Petitioner's jury trial began before the Honorable Donald R. Venezia, J.S.C. (*See* ECF Nos. 7-22 to 7-30.) On November 19, 2012, the jury found Petitioner guilty of first-degree aggravated sexual assault. (*See* ECF No. 7-30; *see also* ECF No. 7-7 at 6-8.) Petitioner was sentenced to a term of fifteen-years imprisonment, subject to the No Early Release Act ("NERA"), along with a mandatory five-year period of parole supervision. (*See* ECF No. 7-31.)

Petitioner filed a direct appeal. On October 1, 2014, the Appellate Division affirmed Petitioner's conviction but remanded for resentencing. (ECF No. 7-3, *State v. Katsigiannis*, No. A-4685-12, 2014 WL 4843978 (App. Div. Oct. 1, 2014).) At resentencing, the court stated it no longer relied upon aggravating factor one, but otherwise left Petitioner's sentence unchanged. *See Katsigiannis*, 2020 WL 1933158, at *1. On April 24, 2015, the New Jersey Supreme Court denied Petitioner's petition for certification. (ECF No. 7-6 at 50, *State v. Katsigiannis*, 221 N.J. 286, 112 A.3d 592 (Table) (2015).)

Petitioner filed a post-conviction relief ("PCR") petition. (ECF No. 7-7 at 9-12.) On March 4, 2019, following oral argument, the PCR court denied Petitioner's PCR petition. (ECF No. 1-1 at 3-36.) Petitioner filed a Notice of Appeal before the Superior Court, Appellate Division. (*See* ECF Nos. 7-5 to 7-10.) On April 22, 2020, the Appellate Division affirmed the denial of Petitioner's PCR petition. *Katsigiannis*, 2020 WL 1933158. On September 22, 2020, the New Jersey Supreme Court denied Petitioner's petition for certification. (ECF No. 1-1 at 76.)

On November 23, 2020, Petitioner filed his instant habeas petition with this Court. (ECF No. 1.) Petitioner asserts the following grounds for relief:

1. The trial court erred by not ordering an evidentiary hearing because Petitioner established a prima facie case of ineffective assistance of trial counsel; and

2. The trial court erred by not granting Petitioner's PCR petition when he established ineffective assistance of appellate counsel.

(*Id.*) Respondents filed an answer asserting Petitioner is not entitled to habeas relief. (ECF No. 7.) Petitioner filed a reply. (ECF No. 9.)

**II. LEGAL STANDARD**

Under the current version of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA), 28 U.S.C. § 2254 provides, the district court "shall entertain an application for writ of habeas corpus in [sic] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing their entitlement to relief for each claim presented in a petition, based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012). District courts are required to "generally defer" to the determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

6

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States: or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In this context, "[c]ontrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the United States Supreme Court. *Eley*, 712 F.3d at 846 (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712 F.3d at 846 (*quoting Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 125 S. Ct. at 1376. Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28

7

U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App' x 694, 697 (3d Cir. 2012) (*citing Rice v. Collins*, 546 U.S. 333, 339 (2006)).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *See Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365–66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

### III. Decision

#### A. Ground One: Ineffective Assistance of Trial Counsel

In his first ground for habeas relief Petitioner argues that the "trial court [on collateral appeal] erred by not ordering an evidentiary hearing because [Petitioner] established a prima facie case of ineffective assistance of trial counsel." (ECF No. 1 at 6.) Petitioner claims that trial counsel was ineffective for failing to call Dominick Cruz as a witness at Petitioner's second trial. (*Id.*) Petitioner argues that Cruz would have "testified (as he did at the first trial that ended with a hung jury) that he observed [Petitioner], the child victim and the victim's mother exit [Petitioner's] room together at the time the State alleged that [Petitioner] assaulted the infant victim." (*Id.*) Petitioner submits that he has presented a prima facie case of ineffective assistance of counsel, which required an evidentiary hearing.[3] (*Id.*)

The standard governing claims of ineffective assistance of counsel is well established, as set forth by the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). To support an ineffective assistance of counsel claim under *Strickland*, a petitioner must first show "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must show counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the

---

[3] Respondents address additional ineffective assistance of counsel arguments Petitioner raised before the PCR court. However, Petitioner did not raise those additional arguments in his Petition here, and he has clarified in his traverse reply that he only intended to raise the ineffective assistance claim regarding Mr. Cruz. (*See* ECF Nos. 1 and 8.) As such, the Court addresses only the above summarized ineffective assistance of trial counsel claim.

9

challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. A petitioner also must affirmatively demonstrate that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687, 692–93; *Shedrick*, 493 F.3d at 299. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must demonstrate "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299.

"Because failure to satisfy either [*Strickland*] prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002) (quoting *Strickland*, 466 U.S. at 697–98).

When a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). For § 2254(d)(1) purposes, "an unreasonable application of federal law is different from an incorrect application of federal law." *Grant*, 709 F.3d at 232. "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal

10

habeas review of ineffective assistance of counsel claims is therefore "doubly deferential." *Id.* (quoting *Cullen*, 563 U.S. at 189). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Grant*, 709 F.3d at 232.

Petitioner raised his ineffective assistance of counsel claim on collateral appeal and the Appellate Division denied it as follows:

> "Determining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront." *State v. Arthur*, 184 N.J. 307, 320 (2005). Defense counsel's decision as to which witnesses he or she will call is "an art," *id.* at 321 (quoting *Strickland*, 466 U.S. at 693), and review of such a decision should be "highly deferential." *Ibid.* (quoting *Strickland*, 466 U.S. at 689). Counsel has a duty, however, "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.
>
> In an affidavit provided to the PCR court, David[4] stated that he routinely took painkillers and muscle relaxers due to injuries sustained as a result of multiple car accidents. As [Petitioner] further certified, on the day David was to be called as a witness, trial counsel informed [Petitioner] that David was "f—ked up and looked anxious." [Petitioner] contended this was "just how [David] acts," and trial counsel allegedly told [Petitioner] he would call David the next day. The following day, trial counsel ended its case-in-chief with [Petitioner]'s testimony and advised [Petitioner] of his trial strategy that it was most effective to present [Petitioner]'s testimony last. We agree with the PCR court that trial counsel's assessment of David's demeanor on the first day of the defense's presentation and his strategy to end with [Petitioner] on the second day rendered his decision against calling David as a witness objectively reasonable under the circumstances.
>
> Further, as David stated in his affidavit in support of [Petitioner]'s PCR petition, he "would have given the same testimony as [he] did at [Petitioner]'s first trial." Notably, at [Petitioner]'s first trial, David never testified that he observed Lucy in [Petitioner]'s bedroom at the time [Petitioner] changed Kelly, and only stated that he saw [Petitioner], Lucy, and Kelly "coming down" the stairs. While he

---

[4] The Appellate Division opinion refers to Mr. Cruz as "David."

> testified that Lucy "had to have been up[stairs] . . . because she came down," David admitted that he had not "heard her or s[een] her" upstairs. Moreover, David also testified on direct examination at the first trial that when he knocked on [Petitioner]'s bedroom door, [Petitioner] "didn't tell [David] he was changing the diaper." This allowed the State to cross-examine him on a prior inconsistent statement he made to Guzman in which he stated he "knocked on the door and [Petitioner] said he was changing a diaper." David's testimony, as at the first trial, would have been subject to cross-examination regarding that prior inconsistent statement.

*Katsigiannis*, 2020 WL 1933158, at *6-7.

Under federal law, a failure to investigate potentially exculpatory evidence or witnesses may form the basis of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 690-91; *see also Brown v. United States*, No, 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016). It is well-settled that an otherwise reasonable decision by counsel not to call certain witnesses is not ineffective simply because it differed from the defendant's wishes. *See, e.g., Diggs v. Owens*, 833 F.2d 439, 445–46 (3d Cir. 1987). Moreover, to succeed on an ineffective assistance claim based on counsel's failure to call certain witnesses, a petitioner must show how their testimony would have been favorable and material. *See United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989). To successfully establish this claim, a petitioner "must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained . . . and whether such information, assuming admissibility in court, would have produced a different result." *See Brown*, 2016 WL 1732377, at *5 (quoting *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (internal quotation marks omitted)). The petitioner must also still demonstrate he suffered prejudice. *See Strickland*, 466 U.S. at 690-91.

Here, in finding counsel's performance was not deficient, the state court did not violate clearly established law and was not unreasonable in their application of *Strickland*. The Appellate Division first found that trial counsel's decision to not call Cruz as a witness when he was visibly

"f—ked up and looked anxious" was objectively reasonable, as was trial counsel's strategy that it was most effective to present Petitioner's testimony last. *Katsigiannis*, 2020 WL 1933158, at *6. The Appellate Division applied *Strickland* and found trial counsel's decision was reasonable. *Id*.

Assuming arguendo, that trial counsel's decision to not call Cruz the following day fell below an objective standard of reasonableness, Petitioner has also failed to meet the prejudice prong of *Strickland*. To show prejudice, Petitioner would have to demonstrate a substantial likelihood of a different result. *See Cullen*, 563 U.S. at 189. As noted by the Appellate Division, Cruz's affidavit to the PCR court did not indicate that he saw the victim's mother in the bedroom with Petitioner, rather Cruz indicated that he "knocked on [Petitioner's] bedroom door and attempted to open the door[, but Petitioner] said he was busy." (ECF No. 7-8 at 7.) Cruz went downstairs and then sometime later observed Petitioner and the victim's mother come down the stairs together. (*Id.*) At Petitioner's first trial, Cruz testified to the same. (*Id.* at 16-17.) At the first trial, Cruz testified that he did not hear the victim's mother in the bedroom when he knocked on the door. (*Id.* at 48.) The State also cross-examined Cruz, asking why in a prior interview Cruz had not indicated that he saw the victim's mother come down the stairs with Petitioner, but rather Cruz had stated that after he knocked on the bedroom door, he went outside and told the victim's mother that she could check on the victim. (*Id.* at 48-49.) Petitioner denied making these statements in the prior interview. (*Id.*) Additionally, Petitioner admitted that his "finger did go in [the victim] by accident" and "a little blood came off [his] finger." (*See* ECF No. 7-6 at 24-25.) Considering Petitioner's admission and the fact that Cruz would not have testified that he actually saw the victim's mother in the bedroom with Petitioner, Petitioner has failed to show that but for counsel's failure to call Cruz at Petitioner's second trial, the outcome of the trial would have been different. *See Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007) (quoting *Strickland*, 466 U.S. at 694).

On habeas review, this Court must provide "double deference" to the state court's disposition of ineffective assistance of trial counsel claims. *Davis v. Adm'r New Jersey State Prison*, 795 F. App'x 100, 102 (3d Cir. 2019), cert. denied sub nom. *Davis v. Johnson*, 140 S. Ct. 2748, 206 L. Ed. 2d 923 (2020) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). Petitioner has not crossed the high threshold to establish that the Appellate Division's denial of his ineffective assistance of counsel claim based on the failure to call Cruz as a witness involved an unreasonable application of *Strickland*. *See Lewis v. Horn*, 581 F.3d 92, 108 (3d Cir. 2009) (even if counsel's investigation and presentation of an alibi defense was deficient, the strength of the evidence of guilt precluded reasonable probability that the outcome of trial would have been different). As Petitioner has failed to show trial counsel was ineffective, the PCR court did not err in not holding an evidentiary hearing. As such, Petitioner's first ground for habeas relief is denied.

### B. Ground Two: Ineffective Assistance of Appellate Counsel

In his second ground for habeas relief, Petitioner argues that the trial court erred in not granting his PCR petition when he established that he was deprived of effective assistance of direct appeal counsel. (ECF No. 1 at 8.) Petitioner argues that he raised the issue that his custodial statement to the police must be suppressed on Fourth, Fifth, and Sixth Amendment grounds. However, on direct appeal, appellate counsel only raised the Fifth and Sixth Amendment grounds. (*Id.*)

Petitioner raised this claim on collateral appeal and the Appellate Division denied the claim as follows:

> We also reject [Petitioner]'s ineffective assistance claim regarding appellate counsel's failure to raise the issue that [Petitioner]'s confession to the officers should have been excluded at trial due to an "unlawful Fourth Amendment seizure" that allegedly occurred when the officers searched his home hours earlier.

14

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by requiring warrants issued on probable cause. "Under our constitutional jurisprudence, when it is practicable to do so, the police are generally required to secure a warrant before conducting a search . . . ." *State v. Hathaway*, 222 N.J. 453, 468 (2015) (citations omitted).

In New Jersey and federal courts, "[t]he exclusionary rule will not apply when the connection between the unconstitutional police action and the secured evidence becomes so attenuated as to dissipate the taint from the unlawful conduct." *State v. Shaw*, 213 N.J. 398, 414 (2012) (internal quotation marks omitted). "In making that determination, the test is not whether the authorities would have failed to obtain the challenged evidence 'but for' their illegal conduct." *Johnson*, 118 N.J. at 653. Rather, "[t]he test followed by both federal and New Jersey courts is based on three factors: (1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct." *Ibid.* (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). Applying those three factors, we have held that evidence seized after a [Petitioner]'s voluntary consent to search should not be excluded if the consent was "'sufficiently an act of free will to purge the primary taint.'" *State v. Chapman*, 332 N.J. Super. 452, 468 (App. Div. 2000) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

Relying on the *Brown* factors, [Petitioner] claims that had appellate counsel raised the Fourth Amendment argument on direct appeal, we would have determined that there was "an unbroken causal connection between his seizure and confession," that his confession should have been suppressed, and that his conviction would have been reversed. We disagree.

Importantly, in our opinion affirming [Petitioner]'s conviction, we "part[ed] company with the suppression judge" in that we concluded [Petitioner] was in custody "for purposes of self-incrimination analysis" at the time the police searched his home. *Katsigiannis*, slip op. at 27-28. We made no comment as to whether [Petitioner] was illegally seized in violation of the Fourth Amendment.

As the State correctly argues, even if [Petitioner] was seized for Fourth Amendment purposes at the time the police searched his residence, he consented to the subsequent search. The State bears

15

the burden to establish knowing and voluntary consent; in other words, "that the individual giving consent knew that he or she had a choice in the matter." *State v. Hagans*, 233 N.J. 30, 39 (2018) (quoting *State v. Carty*, 170 N.J. 632, 639 (2002)). "The lynchpin to voluntary consent 'is whether a person has knowingly waived [his or her] right to refuse to consent to the search.'" *Ibid.* (quoting *State v. Domicz*, 188 N.J. 285, 308 (2006)).

Here, [Petitioner] signed a consent-to-search form permitting the officers to "conduct [a] complete search of the property and premises located at [[Petitioner]'s address]." That form also stated that he provided "consent to search freely and voluntarily without fear, threat, coercion, or promises of any kind," and that he knowingly waived his right to refuse consent. Further, he showed the officers the location of Kelly's bloody diaper and the baby wipes used by Lucy and [Petitioner] to attempt to clean Kelly's wound.

And, even assuming [Petitioner]'s consent to search the home did not render any Fourth Amendment seizure lawful, the State correctly asserts that his confession to the police nearly nine hours later was sufficiently attenuated as to render that confession admissible. Where the connection between the unlawful police conduct and the seizure of evidence is "so attenuated as to dissipate the taint" from the unlawful conduct, the evidence need not be excluded. *Brown*, 422 U.S. at 609 (1975); *see also State v. Badessa*, 185 N.J. 303, 311 (2005).

Applying the *Brown* factors, between eight and nine hours elapsed between the search of [Petitioner]'s home and his confession at the police station. Any unreasonable police seizure at his home nine hours earlier did not influence [Petitioner]'s confession. As such, the temporal proximity factor weighs in favor of the State.

Regarding the second prong, [Petitioner]'s written statement at the police station functions as an intervening event sufficient to purge the taint of any illegal seizure. It was only after that statement, during a verbal recorded interview with Guzman, Corcoran, and Welsh that [Petitioner] admitted that his "finger did go in on accident" and that "a little bit of blood came off [his] finger."

Finally, any alleged police misconduct in searching [Petitioner]'s home was not flagrant. [Petitioner] signed a consent form permitting the police to search his home and directed the police to the location of the trash can containing diapers while inside the home. The record does not indicate that [Petitioner]'s consent was coerced or that the police engaged in any other misconduct while searching

16

> [Petitioner]'s home. Based on the *Brown* factors, any illegal seizure of [Petitioner] by the police was sufficiently attenuated from his confession.
>
> In this regard, as noted, counsel has no obligation to put forth a meritless argument. *See Worlock*, 117 N.J. at 625. As [Petitioner]'s confession at the police station after having written a nonconforming statement was sufficiently attenuated from any alleged Fourth Amendment seizure that occurred during the consent search of his home, [Petitioner]'s claim was meritless. Thus, appellate counsel was not ineffective for failing to argue on [Petitioner]'s direct appeal that [Petitioner]'s confession should have been suppressed based on a Fourth Amendment violation.

*Katsigiannis*, 2020 WL 1933158, at *11-13.

The Constitution prohibits the government from conducting "unreasonable searches" of "persons, houses, papers, and effects," U.S. Const. amend. IV. In *U.S. v. Wade*, 628 F. App'x 144, 148 (3d Cir. 2015), the Third Circuit stated:

> Evidence obtained as a result of a Fourth Amendment violation ordinarily must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). Evidence is not fruit of the poisonous tree and need not be suppressed, however, "if the connection between the illegal police conduct and the discovery . . . of the evidence is so attenuated as to dissipate the taint." *United States v. Perez*, 280 F.3d 318, 338 (3d Cir. 2002) (internal quotation marks and citation omitted). *Miranda* warnings alone do not necessarily render a confession free of the taint of an earlier Fourth Amendment violation. *Brown v. Illinois*, 422 U.S. 590, 603 (1975). Rather, pursuant to *Brown*, to determine whether this causal connection is sufficiently attenuated, we consider: (1) the temporal proximity between the unlawful conduct and the recovery of the evidence; (2) "the presence of intervening circumstances"; and (3) "particularly, the purpose and flagrancy" of the unlawfulness. *Id.* at 603–04; *see also United States v. Dupree*, 617 F.3d 724, 739 (3d Cir. 2010).

The Appellate Division decision was not contrary to clearly established federal law. The Appellate Division applied the test annunciated by the Supreme Court in *Brown v. Illinois*, to find that even if the Court was to assume that Petitioner's consent to search his home did not render

any Fourth Amendment seizure lawful, the connection between the seizure and Plaintiff's confession was sufficiently attenuated. *Katsigiannis*, 2020 WL 1933158, at *12. The state court noted that (1) Petitioner's statement was given over eight hours after Plaintiff was allegedly seized at his home at 6:30 a.m.; (2) there was an intervening voluntary written statement before Petitioner confessed to digitally penetrating the victim; and (3) there was no evidence that Petitioner's consent to search his home was coerced or the police engaged in misconduct. *Id*. Petitioner has failed to show the Appellate Division finding that Plaintiff's Fourth Amendment argument was meritless was an unreasonable application of clearly established law.

Since the underlying substantive claim is meritless, trial counsel could not be ineffective for failing to raise a meritless argument. *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000). As such, this ground for habeas relief is denied.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right. Therefore, no certificate of appealability shall issue.

## V. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

**Date:** March 30, 2023

                                             */s/Brian R. Martinotti*
                                             **HON. BRIAN R. MARTINOTTI**
                                             **United States District Judge**